In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00256-CV

_____

IN THE INTEREST OF L.W.R.L. AND S.O.L.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 23-06-08055-CV

MEMORANDUM OPINION

After a bench trial, Appellants W.B. ("Wayne") and J.G. ("Jill") appeal from an order terminating their parental rights as to one-year-old S.O.L. ("Sarah") and two-year-old L.W.R.L. ("Luke") (collectively "the children").[1] We affirm.

---

[1] To protect their identities, we use pseudonyms to refer to the minor children, their parents, and other persons not associated with the Department of Family and Protective Services, law enforcement, or service providers. *See* Tex. R. App. P. 9.8(b)(2). As for Wayne, the Order of Termination terminated his parental rights to his son, Luke, and terminated his parental rights to Sarah "if any existed." Parental rights of a named potential father of Sarah, J.W. ("James"), and her "unknown father" were also terminated, and James is not a party to this appeal.

1

## Background and Evidence

The Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship on June 6, 2023, together with an Affidavit in Support of Removal from a representative of the Department. In the affidavit, the Department alleged it had received a report on May 19, 2023, with allegations against Wayne and Jill for neglectful supervision of their one-year-old son, Luke. According to the affidavit, Jill drove with Luke with no car seat to pick up Wayne from an unknown residence where he assaulted Jill by punching her face, and he left the scene before the police arrived. Later that same day, a "re-referral" was received because Jill, who was pregnant (with Sarah), had not sought any medical treatment through her pregnancy, Jill had admitted being under the effect of methamphetamine, and Jill exhibited "track marks" on her arms, legs, and belly. The representative stated that she contacted Jill that same day and observed Jill's swollen black eye, which Jill reported was caused by Wayne when he punched her the night before. Jill admitted to past physical domestic violence with Wayne, and she admitted she and Wayne used drugs. The representative noted that Jill admitted that she had relapsed and used marijuana and methamphetamine in March, the month after she found out she was pregnant with Sarah. According to the affidavit, Jill reported that she was raped by J.W. ("James"), and Jill was not sure if

James or Wayne is Sarah's father. The representative implemented a supervision plan for Luke with Jill's relative. Jill initially agreed to take a drug test over the next few days, but she ultimately refused to take a drug test during that week.

On June 4, 2023, the Department received a third intake with allegations against Jill for the neglectful supervision of Sarah, when Jill and Sarah tested positive for amphetamines at the time of Sarah's birth and Jill admitted to using drugs in the month before Sarah's birth. According to the affidavit, at the hospital, Jill reported to a Harris County Investigator that she had used methamphetamine the prior Thursday and that she had used methamphetamine "once or twice a week" since moving back to her mother's residence and she had been a "daily user" prior to that. The County Investigator noted that Jill explained that her black eye was caused by Wayne, but Jill claimed that Wayne hit her in self-defense because she hit him first. According to the affidavit, the County Investigator ended the interview due to concerns that Jill was under the influence of drugs. The next day the Department representative confirmed with the hospital that both Jill and Sarah tested positive for methamphetamine.

The affidavit noted that in September of 2022, the Department had received a report with allegations of neglectful supervision of Luke after an altercation between Jill and Wayne. Jill was observed to have two black eyes that were healing. The allegations of Wayne's abuse were given a disposition of "ruled out[]" after Jill

3

denied being physically assaulted and Wayne could not be located. The affidavit also documented both Jill's and Wayne's extensive criminal histories. Considering the children's vulnerable age and inability to protect themselves, the Department representative concluded that there was a serious concern for Luke's and Sarah's safety and well-being in Jill's and Wayne's care due to their continuous drug use and alleged physical domestic violence. The representative asked that the Department be named the children's temporary managing conservator so the children could be placed in a safe environment.

In the trial court's Order for Protection, the trial court found that the children had been neglected or that their physical health or safety was in immediate danger on one or more occasions and that the children continuing to live in Jill's home would be contrary to the children's welfare. In the Order for Protection, the trial court named the Department as the children's temporary sole managing conservator and, among other things, required Jill and Wayne to comply with the Department's service plan. After hearing and denying Jill's Motion for General Extension the trial court heard evidence on June 6, 2024, and June 28, 2024.

Testimony of Officer Jacob Hayden

Officer Jacob Hayden with the Montgomery County Precinct 5 Constable's Department testified that he is familiar with Wayne because he had arrested Wayne once and had contact with him a few times prior to the last arrest for violence toward

4

Jill. According to Officer Hayden, he conducted traffic stops when Wayne had been in the vehicle and those stops resulted in arrests. Officer Hayden recalled that he also is familiar with Jill and has arrested her once.

Officer Hayden testified that on August 31, 2021, while working patrol, he conducted a traffic stop of a vehicle for an expired registration and no insurance, and Jill was the driver and Wayne was the passenger. According to Officer Hayden, Jill appeared nervous, avoided eye contact with him, and was sweating profusely. Officer Hayden recalled that he asked them if they had been arrested before, and they both stated they had been arrested for possession of a controlled substance. Officer Hayden testified that he had Wayne exit the vehicle, Wayne gave him consent to check Wayne's pockets, and Officer Hayden found a syringe commonly used with narcotics in Wayne's pocket. Officer Hayden testified that once Wayne admitted he sometimes used syringes for narcotics, Hayden believed he had probable cause to search the vehicle. Inside the car he found Jill's purse and inside the purse he discovered a syringe with a brown liquid substance inside it that field-tested positive for methamphetamine.

Officer Hayden testified that he arrested Jill for possession of a controlled substance and transported her to the jail. Officer Hayden stated he did not find Wayne in possession of methamphetamine, and Wayne was released and left in the vehicle. According to Officer Hayden, Jill was not admitted to the jail because she

was "refused [by] medical staff due to high blood pressure and high heart rate[]" and she was taken to the Conroe Regional emergency room. Officer Wayne recalled that Jill told him she was pregnant, and on the way to the emergency room, she told him that when he initiated the traffic stop, she and Wayne had a syringe full of methamphetamine and they "both took a loaded syringe and actually shot it inside their mouths." Officer Hayden testified that this concerned him and that he had never heard of drug users using a syringe inside their mouth. He recalled that after Jill was cleared by medical staff at the hospital she was taken to jail.

Testimony of Officer Braden Moye

Officer Braden Moye with the Conroe Police Department testified that he was familiar with Jill because he arrested her on August 16, 2023, when he was on patrol. According to Officer Moye, he conducted a welfare check after a man called dispatch and reported that a woman had been asleep in a car for at least three hours in front of his house. Moye arrived at the scene and observed Jill passed out behind the steering wheel with the vehicle off. Officer Moye recalled that after he woke Jill up, he had her step out of the vehicle, and after he observed her profusely sweating, he asked her if she knew where she was. According to Officer Moye, Jill answered that she thought she was in Tomball, which Moye explained at trial "is pretty far away[,]" and Jill granted Moye consent to search her and the vehicle. Officer Moye testified that he had a female officer respond to the scene to search Jill. Officer Moye

6

recalled that inside Jill's purse in the car he found a pipe, a syringe with brown liquid inside it, and photos with Jill and her children. He also found loose methamphetamine crystals around the radio area of the vehicle. The syringe with the brown liquid and the crystals both field-tested positive for methamphetamine. According to Officer Moye, he arrested Jill for felony possession of a controlled substance and transported her to the Montgomery County Jail.

Testimony of Officer Austin Ennis

Officer Austin Ennis with the Montgomery County Sheriff's Office testified that he filed a felony arrest warrant on Wayne for assault of a pregnant individual on May 19, 2023. According to Officer Ennis, the victim in the case was Jill, and he had responded to a call from Jill's sister reporting an assault. Officer Ennis recalled that when he arrived at the scene, it was obvious that Jill was pregnant, and she was crying. Officer Ennis testified that Jill initially refused to answer his questions and was "visibly agitated with [his] presence there[,]" and that as he continued to talk to her, he noticed swelling on her face and around her eye and redness consistent with a recent assault. According to Officer Ennis, it was reported to him that Jill had also been pushed to the ground. This, along with reports from medics on the scene that Jill had a heightened heart rate and blood pressure, made Officer Ennis concerned for the baby's health. Officer Ennis recalled that he recommended that Jill get medical care, he called EMS to the scene, and she agreed to go to the hospital.

Officer Ennis determined that Wayne was the suspect after Jill's sister and the homeowner placed Wayne at the scene and stated that he fled shortly prior to Officer Ennis's arrival. Wayne did not respond to the messages Officer Ennis left with Wayne's registered phone number or email, and Wayne was later arrested.

Testimony of Mackinzie Raymon

Mackinzie Raymon, a paramedic with the Montgomery County Hospital District, testified that she responded to the assault call and treated Jill at the scene. Petitioner's Exhibit #2, Raymon's report from the scene, was admitted into evidence over counsel's objection "to any hearsay that's contained within it." Raymon recalled that when she arrived on the scene, everyone was outside in the driveway, and Jill, who said she was pregnant and was "obviously pregnant[]" at the time, was walking around anxiously and crying. Raymon testified that Jill was "compliant" on the scene and that "[s]he had an obvious left-sided swelling to [and] around her eye that was starting to bruise." According to Raymon, when Jill was being administered an IV, Raymon noticed what appeared to be multiple "injection marks[]" on Jill's arms. Raymon testified that the medics were concerned for Jill as she had a very high blood pressure and heart rate and was complaining of a headache that had been going on for a couple of weeks and was "pre[-]eclampsic."

Raymon recalled that Jill reported to EMS that she and Wayne had an altercation and Wayne punched her in the face, and Jill's sister reported that he had

8

also pushed Jill down. According to Raymon, she never saw Wayne at the scene. Jill admitted to Raymon that Jill had used drugs in the past, but Jill told Raymon there was no recent drug use. Raymon testified that Jill told her that she had not seen a doctor regarding the pregnancy, and she was not receiving any prenatal care.

Testimony of Samantha Causey

Samantha Causey, an investigator with the Department, testified that she began investigating the case on May 19, 2023, after allegations of neglectful supervision due to concerns of domestic violence and possible drug use. Causey testified that Jill's children that were the subjects of the investigation were Luke and Sarah. According to Causey, she first made contact with Jill at her residence and observed an injury to Jill's face. Causey recalled that Jill was pregnant with Sarah at the time, and that Jill reported that Wayne had punched her in the face. Causey testified that Jill told her that she had been sober from drugs until September but had relapsed two months prior in March. Causey recalled that Jill told her that she had a previous history of methamphetamine use, and that she knew she was pregnant in February and relapsed with methamphetamine in March.

Causey implemented a supervision plan where the grandmother that lived in the home would supervise Jill at all times with Luke. According to Causey, she asked Jill to take a drug test and Jill agreed, but she did not take a drug test immediately and finally was tested about a week later. Causey recalled that she asked Jill if she

9

would be willing to go to inpatient treatment for the methamphetamine abuse, and she asked Causey "why she would have to go to inpatient for being punched in the face." Causey did not specifically remember offering services to Jill regarding the domestic abuse, but Causey testified that in similar situations she would typically provide resources and recommend the Montgomery County Women's Center.

Causey testified that she started the removal process when at Sarah's birth Jill and Sarah both testified positive for drugs. Causey testified that the specific safety risks leading to the children's removal were Jill's and Wayne's history of domestic abuse and methamphetamine use and "two vulnerable children who were unable to defend themselves." Causey recalled that all of the children's immediate caregivers had "issues" and the Department could not place the children with them and that Causey requested a full home study on an aunt that did not live in the home. According to Causey, after doing her part in the investigation, she was not involved in the services offered to assist the family. Causey testified that when she investigated the case, she was never able to locate Wayne.

Testimony of Kassie Sauer

Kassie Sauer, a Department Conservatorship Worker on the case, testified that she was assigned the case in June of 2023, and the Department gained temporary managing conservatorship of Luke and Sarah on June 6, 2023. Sauer testified that Wayne completed an Affidavit of Paternity as to Luke, but that DNA testing

10

excluded him as Sarah's father. According to Sauer, Jill provided a name of a possible father to Sarah, but Sauer was never able to locate him, and he was not registered in the paternity registry in this case. The court-ordered service plans for both Jill and Wayne were admitted into evidence.

Sauer recalled that a court-ordered service plan was developed for Jill that, among other things, required her to submit to random drug testing and maintain contact with Sauer. As far as whether Jill had completed her service plan as of the time of trial, Sauer testified that Jill had failed to fulfill the following requirements: "parenting classes, onetime parent collaboration group, obtaining safe and stable housing and providing verification, obtaining employment and providing verification." According to Sauer, Jill also had failed to do a substance abuse assessment. Sauer recalled that Jill went into an inpatient drug facility in March of 2024 about a month after she was released from jail, and although the program is typically "90 days minimum[,]" the facility contacted Sauer because Jill left the program after twelve days. Sauer testified that Jill was incarcerated three different times in the case—June 30, 2023, August 16, 2023, and approximately May 4, 2024. Sauer recalled that the second incarceration was for an extended period of time but that prior to that incarceration, Jill could have worked towards completing her service plan but did not. Sauer testified that she observed visits between Jill and Sarah and had concerns. According to Sauer, Jill was "under the influence . . . falling

11

asleep, almost dropped the newborn at the time[,]" and Sauer "had to intervene." Sauer recalled that she gave Jill instructions on how she could call the provider of the domestic violence classes required by Jill's service plan and that the contact information for the provider was listed on the service plan, the provider attempted twice to set up services for Jill, but the attempts were unsuccessful. According to Sauer, emails sent to Jill about the classes contained expiration dates, but Jill was "letting them expire[,]" and the Department sent updated emails when requested. Sauer recalled that Jill never submitted to a psychological evaluation, nor did she ever address the domestic violence. Jill also did not provide Sauer with any certificates of completion of any services she completed while incarcerated. Sauer testified that the purpose of the services required by Jill's service plan was to alleviate the Department's concerns, and Jill had not done anything that would alleviate those concerns. On cross-examination, Sauer testified that Jill had completed some "worksheets" as part of her services while she was incarcerated. Sauer recalled that Jill had moved several times, and that although she had recently provided Sauer an address, Jill had not provided verification of housing.

Sauer recalled that Jill took a drug test after she was released from jail. Petitioner's Exhibit #11, the lab results from that drug test, were admitted into evidence over the defense's objection. The urinalysis test results for the drug test on April 4, 2024, indicated that Jill tested positive for methamphetamine.

12

Sauer testified that Wayne had been incarcerated in the Montgomery County Jail for the entirety of this case, completed no services on his court-ordered service plan, and had no visitations with Luke. Sauer recalled that Wayne was incarcerated for the domestic violence incident with Jill. Petitioner's Exhibit #12, identified by Sauer as an audio recording of a jail call between Jill and Wayne from March 21, 2024, was admitted into evidence and played at trial. According to Sauer, she had concerns about certain parts of the recording, including when Wayne admitted to being a drug user; when Wayne admitted that when he was playing with Luke "he couldn't pick him up because [Wayne] was high[;]" and a discussion about Jill using illegal drugs while she was pregnant. Sauer recalled that she met with Wayne while he was incarcerated, and he admitted to methamphetamine use for several years. Sauer testified that the only service Wayne participated in as part of his service plan while incarcerated was "the mental health checks from the counselors." According to Sauer, the only service from his service plan that Wayne complied with was maintaining contact with Sauer, and otherwise he failed to comply with his service plan by failing to: obtain employment with verification; obtain safe and stable housing with verification; complete a substance abuse assessment and domestic violence assessment and follow the recommendations from those assessments; complete parenting classes; and complete a onetime parent collaboration group.

13

Sauer recalled that Jill's grandmother was considered for a potential placement for the children, but the home study was denied "[d]ue to the other household members having significant history of manufacturing and delivering [] controlled substances and . . . current drug use in the home." Sauer testified that the household members were Jill's sister ("Glenda"), Jill's mother ("Susan"), and Jill's grandmother ("Felicia"). Susan was also denied as a potential placement because she lived in that household. Sauer testified that in the initial stages of the case, Jill's other sister, "Casey," was considered a possible placement for the children. Casey was ruled out because one of Casey's household members at that time—her boyfriend— had a felony conviction, and Casey never later contacted Sauer asking for the children to be placed with her. According to Sauer, there were also concerns with Casey's background. Ultimately, the judge put an order in place that the children were not to be moved from the foster family unless CASA and the attorney ad litem agreed to move them. Sauer testified that there would not have been another appropriate place to move the children. Sauer recalled that the people Jill named to the Department as potential placements for the children were "already ruled out[.]"

Sauer testified that she believed that it was in the children's best interest for parental rights to be terminated and for the children to stay in their current placement with their foster family. According to Sauer, the Department's goal was unrelated adoption, and the children's current placement was a foster placement in a "foster-

adopt home[.]" Sauer testified that the children's current placement was intended to be their permanent placement, the children's needs were being met there, and she had no concerns about the placement. Sauer explained that she had visited the children monthly, that the children's current placement had been where they have been placed the entire time, and that the children were well bonded with the foster family. Sauer testified that in their current placement, the children were safe, not neglected, and doing well with the foster family.

Wayne's Testimony

Wayne testified that he is Luke's father and at the time of trial he was incarcerated on "assault family violence and violation of bond protective order." He testified that the violation of the bond protective order was for communicating with Jill when she was incarcerated, and they were writing letters to each other. He recalled that on one occasion while he was incarcerated, he saw Jill in the hallway going to Narcotics Anonymous classes and hugged her, but she did not want him to get her in trouble and she did not hug him back. Because of that contact, he "got written up for unauthorized contact[]" and "15 days disciplinary." Wayne testified that he did not know that a protective order was in place even though he was incarcerated for domestic assault.

According to Wayne, on the night of the May 19, 2023 incident, he was at K.F.'s ("Kerry's") house. When asked to testify about what happened that night,

Wayne asserted his Fifth Amendment right against self-incrimination. He testified that in the audio recording of the jail phone call played at trial, he lied when he said Jill was high that night because he wanted to "manipulat[e] the phone call, knowing that people were listening to it to use during [his] criminal trial[,]" and he wanted to get out of jail. He testified that he did not hit Jill that night.

The prosecution admitted exhibits, which documented Wayne's criminal history including the following:

- an indictment against Wayne for assault family/household member with previous conviction for the assault against Jill on May 19, 2023;
- an indictment against Wayne for violation of bond/protective order more than two times within twelve months by communicating with Jill from July 12, 2023 through October 5, 2023;
- a 1996 judgment against Wayne for aggravated assault and sentencing him to six years in prison, but suspending the sentence and placing him on community supervision for six years;
- a 1997 judgment of conviction against Wayne for assault upon revocation of his probation after he pleaded true to allegations in the State's motion to revoke and wherein Wayne was sentenced to six years of confinement;
- a 2003 judgment against Wayne for assault that sentenced him to one year in jail;
- a 2004 judgment against Wayne for interference with an emergency call that he pleaded guilty to and was sentenced to one year in jail;
- a 2011 judgment against Wayne for assault bodily injury that he pleaded guilty to and ordered to pay a fine;
- a 2012 judgment against Wayne for aggravated assault against a family member for hitting his girlfriend with a bat that he pleaded guilty to and was sentenced to three years of incarceration;
- a 2017 conviction against Wayne for possession of a controlled substance for which he received a sentence of 90 days in jail;
- a 2017 conviction against Wayne for assault causing injury to a family member (enhanced by his prior conviction for assault to a family

16

member) for which he pleaded guilty and was sentenced to five years of confinement; and

- a 2017 conviction against Wayne for possession of a controlled substance to which he pleaded guilty and was sentenced to five years of confinement.

Wayne testified that one of his assault convictions was against a police officer and one of the other assault convictions resulted from when he used a baseball bat to assault his girlfriend at the time.

According to Wayne, in October of 2022, he was arrested and jailed on a "blue warrant" because he had been out on parole for his assault and possession of a controlled substance charge, and he failed several drug tests and did not to go to rehab. When asked whether he and Jill used methamphetamine together, Wayne responded, "I was never around the house or her when I got high, no." Wayne testified that while he was in jail, Luke and Jill lived with her mother. Wayne testified that during that time is when Sarah's father raped Jill, and he had initially thought that Jill cheated on him which caused them to have arguments.

As for Wayne's service plan while incarcerated, he testified that he applied for mental health services, counseling, substance abuse services, domestic abuse services, parenting services, and "anything . . . to show CPS that [he] want[ed] his children." Wayne recalled that he had participated in counseling and substance abuse classes while in jail but that parenting classes, domestic violence classes, or drug and alcohol assessments are not offered. Wayne testified that he had worksheets from

his counseling that show the work he did in counseling, but that certificates are not awarded for the counseling. According to Wayne, he last used methamphetamine a year before trial when he was arrested on July 3, 2023, but he said that he had not had access to drugs while incarcerated. Wayne testified that between the May 19th incident with Jill and when he was arrested in July, he had contact with Jill but did not know if she was using methamphetamine during that time.

Wayne testified that he and Jill are no longer in a relationship but that he calls her often from jail. He admitted that he had called her three or four times the day before trial and three or four times the day prior to that. According to Wayne, Jill had wanted to leave him in the past, but he wanted to leave her because he knew he was not "in her best interest[,]" and his being around her and the children puts them in danger because of his addiction to methamphetamines, and he had "taken advantage of her weaknesses[.]" Wayne testified that "[t]his is all my fault[]"; he will always love her and regret every day for messing up her life; and Jill's children were taken from her because of him. Wayne explained that he loves his children.

Jill's Testimony

Jill testified that the case began because of the incident with Wayne at Kerry's house on May 19th. When asked if Wayne hit her that night, she responded that she did not want to answer the question. After the trial judge instructed her to answer the question, she admitted that Wayne had hit her. According to Jill, the incident

happened when she "went somewhere [she] wasn't supposed to go. . . . [and she] should have just stayed home." Jill recalled that Luke was in the car at the end of the driveway with her sister, Glenda, during the incident.

Jill testified that at the time of the incident with Wayne hitting her, she lived with her mother, her sister, and Luke at her mother's home. Jill was the primary caregiver for Luke for the fifteen months after his birth. She gave birth to Sarah on June 4, 2023, a couple of weeks after the incident. Jill recalled that Sarah was removed by the Department three days after she was born. Photographs of Jill with Luke were admitted into evidence. Jill testified that she loves her children and that she did not believe that the termination of her parental rights was in the children's best interest. She testified that she wanted a chance to raise her children.

Jill agreed that she received her service plan in this case and that she was incarcerated for six months during this case. According to Jill, she was admitted into a drug rehab program at Santa Maria in March of 2024 when she was released from jail, but she was forced to leave the program earlier for being disrespectful. She testified that during her three weeks in the program she participated in drug rehabilitation classes, a CPS class, and "[s]hame resilience classes." At the time of trial she was trying to get into another drug rehab program, but she was having difficulty with insurance. Jill testified that she had completed some of the services required by her service plan such as getting a house and obtaining employment, but

19

she acknowledged that she had not provided the Department proof of those yet. Jill recalled that while incarcerated she also completed classes such as a faith-based class and mental health classes and counseling. Jill testified that she was not able to complete services that involved Behavioral Solutions because of "communication problem[s.]" Jill testified that she completed over 80 worksheets sent to her by her mental health counselors, and while in jail she had a job passing out food and cleaning. According to Jill, she had not completed the psychosocial evaluation, and the online questionnaire that she was supposed to complete kept expiring. Jill testified that she had been living in Dallas for the past three weeks and working for Acme brick company "[a] few times a week."

The prosecution admitted exhibits that documented Jill's criminal history, including the following:

- an indictment in 2016 for possession of methamphetamine a charge to which she pleaded guilty and was dropped after she completed the C.A.R.E. drug program;
- a 2016 conviction for driving while intoxicated to which she pleaded guilty and was sentenced to 30 days in the Montgomery County Jail;
- a 2019 conviction for engaging in organized criminal activity to which she pleaded guilty and received two years in jail;
- an indictment in 2019 for possession of methamphetamine but the charge was dismissed because she was convicted in another case;
- a 2020 complaint for burglary of a building that was dismissed after Jill was convicted in another case;
- a 2022 conviction for possession of a controlled substance for which she pleaded guilty and was sentenced to 240 days in jail;
- a 2021 indictment for possession of methamphetamine but that charge was dismissed because she was convicted in another case;

- a 2023 indictment for possession of methamphetamine on or about June 30, 2023, but the charge was dismissed when she pleaded guilty in another case;
- a 2023 conviction for burglary of a building to which she pleaded guilty and was sentenced to 180 days in jail;
- a 2023 indictment for possession of methamphetamine on or about August 16, 2023, but the charge was dismissed when she pleaded guilty to another charge; and
- a 2024 probable cause affidavit stating that on or before May 4, 2024, Jill possessed methamphetamine.

Jill agreed that since the time her children were removed in this case, she had been arrested three times for offenses—two times for possession of a controlled substance and once for burglary of a building. Jill admitted that she had a substance abuse problem with methamphetamine for a lot of her life and testified that she had not used methamphetamine in "a long time." Jill testified that her charge in the recent arrest in Harris County for possession of a controlled substance was dismissed because she completed the C.A.R.E. court-ordered drug program that included classes and sixteen or seventeen months of drug testing and weekly court appearances. Jill testified that she also completed a substance abuse assessment as part of the classes. According to Jill, she believed she was on the right path at that time but was "not really sure how to go about addressing [her domestic violence situation.]" On cross-examination, Jill acknowledged that she tested positive for methamphetamine on April 4, 2024, the month after she left the drug rehab facility.

Testimony of the Court Appointed Special Advocate ("CASA")

The CASA testified that she had been assigned to the case for its duration and had visited the children in their current placement. She testified that she believed that it was in the children's best interest that the parents either relinquish their rights or that their parental rights be terminated, and her recommendation was that the children be adopted. According to the CASA, the parents allowed their needs for drugs and criminal activity to outweigh the needs of the children. The CASA recalled that she had observed visits between Jill and her children over the past year and that, although Jill struggled to bond with her children initially, there had been some good visits. The CASA testified that at some of the initial visits, Jill would "nod off[]" and she would allow Luke to climb on things. The CASA recalled that at one of the visits Jill was falling asleep, and she almost dropped Sarah and "we had to run in there real quickly." Jill would often bring toys and food to the visit for the children. The CASA testified that during the pendency of the case her only communication with Wayne was when she spoke to him at court. She agreed that she never had the opportunity to interview him or observe him interact with Luke or Sarah. The CASA explained that Luke and Sarah had been in the same placement during the entire case, and in their current placement, Luke and Sarah were doing well and were happy and growing. According to the CASA, Sarah was walking and loving towards her

22

foster parents. The CASA testified that Luke was also loving towards the foster parents and was socializing well.

Susan's Testimony

Susan, Jill's mother, testified that she raised Jill. According to Susan, Jill and Luke lived in Susan's home since Luke was born and until the children were removed. Susan recalled that Jill took care of Luke in the home and Susan worked sixty hours a week. Susan testified that she observed Jill as a mother to Luke and described Jill as an "[e]xcellent[]" parent that "loves babies[,]" and that during that time he was not neglected, and Jill protected him from harmful situations. Susan testified that Jill had a huge support system to rely on and had a large family and friends nearby.

Susan recalled that she asked Jill to leave the home on January 1, 2023, due to Jill's relationship with Wayne because Susan "didn't want their arguing or anything around" Luke. Susan testified that she asked Jill to leave because Susan did not want Wayne around the house, and she had already made "quite a few" calls to 911. Susan recalled that she kept Luke at her home because she did not think it was safe for him to be around Jill and Wayne when they were together and fighting. Susan explained at trial that even though Jill was not at the house, Jill saw Luke every day during that time. According to Susan, Jill is a victim of domestic violence, that Wayne was the perpetrator of that violence, and that is why Susan no longer

23

allowed Wayne to come to her home. Susan testified that although she witnessed Wayne physically harm Jill, he never physically harmed Luke. According to Susan, at the time of the assault on May 19, 2023, she had allowed Jill to move back home because Jill was about to give birth and Susan did not want her around Wayne. Susan recalled that on that date, she was at home in bed and Luke was in the car with Jill's sister Glenda, "but [Jill, Glenda, and Luke] were all together" when Wayne assaulted Jill. Susan testified that she, Jill's two sisters, and Susan's mother Felicia, all helped care for Luke.

Susan testified that she had seen a change in Jill from the beginning of this case until the time of trial. According to Susan, since the time Jill had been released from incarceration, Jill had gotten away from bad influences, was working at a local "vape shop[,]" was living in a three-bedroom home that was suitable and safe for her children, just got a new car, and appeared to be trying to start a new life for herself without Wayne. Susan recalled that Jill obtained her GED while she was incarcerated. Susan testified that she felt like Jill would be able to provide a safe and stable environment for Luke and Sarah, and Susan believed it was in the children's best interest for them to be returned to Jill.

Susan testified that she knew that Jill had been arrested for possession of methamphetamine after being released from jail, but she still believed that Jill had made a complete change "[c]ompared to where she's come from[]" even though she

24

tested positive for methamphetamine and was arrested for methamphetamine. Susan also agreed that when Jill was released from jail, she continued to be in contact with Wayne, but now that he was "going away for . . . a long time[,] and she's moved on."

She testified that she had no visits with Sarah and only saw her at the end of one of Jill's visits with Sarah. Susan recalled that all other requests for her to see Sarah were denied. Susan admitted that she had a criminal history, she was charged with possession with intent to deliver drugs in 2017, her probation was revoked, and she completed her parole for the charge. Susan denied ever using drugs with Jill.

Glenda's Testimony

Glenda, Jill's younger sister, testified that she and Jill have a close relationship and lived together at their mother's house with Luke, and that at some point Jill moved out. Glenda recalled that on May 19, 2023, she took Jill to see Wayne, and Luke was in the car with them. According to Glenda, Jill exited the car, and Glenda stayed in the car with Luke. Glenda testified that after about five minutes, Wayne and Jill had a "heated[]" disagreement and Glenda called the police. Glenda recalled that two officers responded, and Officer Ennis stated that he was concerned about Jill and her pregnancy. According to Glenda, Officer Ennis threatened Jill multiple times that if she did not get an ambulance and leave, that law enforcement was "going to call CPS on her[,]" and that even after she left in the ambulance, law

25

enforcement still called CPS. Glenda testified that she witnessed Jill and Wayne's "altercation[]" and was worried about Jill because she was upset, but Glenda was not worried about Jill's health. Glenda recalled that she observed Wayne hit Jill and push her. Glenda agreed that Jill tried to cooperate and ultimately agreed to go to the hospital. Glenda recalled that although Jill was distraught at the scene, there was no reason for concern for Luke because he was asleep in the car. According to Glenda, she had planned on leaving the scene and picking up her mother at home and then taking Jill to the hospital. Glenda agreed that she had witnessed Wayne commit domestic violence against Jill "maybe twice[]" prior to this assault, but she could not recall the dates or whether Jill needed medical attention. Glenda testified that Luke was not present at the two prior incidents. Glenda testified that she took Jill to Wayne's house, despite Wayne's past violence against Jill and despite the calls their mother had made to the police, because Wayne had asked Jill to come over and Jill wanted to go.

Glenda admitted to accepting Wayne's phone calls from jail, that he called her quite often and he talked to her about court, but she could not recall what he said. According to Glenda, Jill had had long-term and short-term boyfriends in the past, and that at the time of trial, she was dating Alex.

Glenda testified that she is bonded to Luke and has helped care for him. Glenda testified that she had no knowledge that Jill had used methamphetamine

during the pendency of this case, and the only indication Glenda had that Jill had used methamphetamine in the past was when Jill was jailed prior to this case. Glenda believed that Jill is a good mother and that she had provided Luke "everything he needed plus more[]" and that Luke had never been neglected. Glenda testified that she had no concerns with Luke and Sarah being returned to Jill.

Sheila's Testimony

Sheila, a friend of Jill's family, testified that she had known Jill since Jill was born. Sheila testified that she had had numerous opportunities to observe Jill with Luke, that Jill was Luke's primary caregiver, and that Luke was well cared for. According to Sheila, she observed Jill be protective of Luke and never neglectful of him or hurtful towards him. Sheila recalled that Jill changed Luke's diapers and made sure he was fed and taken care of. Sheila testified that she believed that it was in the children's best interest for them to be returned to Jill, but she also agreed that a parent that uses methamphetamine is neglectful and not a good parent.

Alex's Testimony

Alex, Jill's boyfriend of about five months at the time of trial, testified that he had known Jill for over ten years and that he used to be a neighbor to Jill and her sisters. Alex testified that he has three children, that Jill was "wonderful" around them, and they love her. Alex testified that his children live with their mothers, but that Jill was around the children on weekends. Alex recalled that he had not had an

opportunity to observe Jill around her children. According to Alex, Jill lives with him and was trying to get her life in order. Alex testified that Jill was employed and has transportation. Alex agreed that he had "[v]arious misdemeanors when [he] was young. Possession of marijuana probably the most[,]" and that the charges were more than eight years before trial. Alex testified that the last time he was in jail was about two years before trial for unpaid traffic tickets, he served jail time six years before trial for unpaid traffic tickets, and then was in jail approximately ten years before trial for possession of marijuana. Alex testified Jill's criminal history and history of drug use did not make him concerned about her being around his children.

The Termination Order

After the bench trial, the trial court signed a final order terminating Jill's parental rights to the children and Wayne's parental rights to Luke and to Sarah (if any parental rights to Sarah existed). The trial court found that the Department had shown, by clear and convincing evidence, that it was in the children's best interest for Jill's and Wayne's parental rights to be terminated. The trial court found that the Department had shown by clear and convincing evidence grounds for termination of Jill's parental rights under section 161.001(b)(1)(D), (E), and (O). The trial court found that Jill had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; she engaged in conduct or knowingly placed the children with persons who

28

engaged in conduct which endangered the children's physical or emotional well-being; and she failed to comply with the court-ordered service plan. As to Wayne, the trial court found that the Department had shown by clear and convincing evidence grounds for termination of Wayne's parental rights under section 161.001(b)(1)(D), (E), (N), and (O). The trial court found that Wayne had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; he had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's emotional or physical well-being; he constructively abandoned the children under section 161.001(b)(1)(N); and he failed to comply with the court-ordered service plan. The Order of Termination appointed the Department as the children's permanent managing conservator. Jill and Wayne timely appealed.

## Issues on Appeal

Jill presents four issues on appeal:

1. The trial court erred when it denied the Motion for General Extension filed by Jill.
2. The trial court erred in admitting Petitioner's Exhibit #2 into evidence because it was hearsay.
3. The trial court erred in admitting Petitioner's Exhibit #11 into evidence because the Department did not prove the chain of custody.
4. The evidence was insufficient to support the predicate grounds for termination under Texas Family Code Sections 161.001(b)(1)(D), 161.001(b)(1)(E), 161.001(b)(1)(O), and 161.001(b)(2).

Wayne also presents four issues on appeal:

1. The evidence was legally and factually insufficient to support termination under section 161.001(b)(1)(D).
2. The evidence was legally and factually insufficient to support termination under section 161.001(b)(1)(E).
3. The evidence was legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the children's best interest.
4. The evidence was legally and factually insufficient to support the appointment of the Department as the children's sole managing conservator.

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that the termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder

could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.). We defer to the factfinder's credibility determinations as long as they are not unreasonable. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

<u>Denial of Jill's Section 263.401(b) Motion for Extension</u>

In issue one, Jill argues that the trial court abused its discretion when it denied her motion requesting a continuance. Jill argues she needed more time to complete her services because she spent a significant amount of time incarcerated and could

not participate in the services required to complete her service plan. Three days before the trial setting, Jill filed a "Motion for General Extension." Jill's motion stated that the trial was set for June 6, 2024, and set for dismissal on June 10, 2024, and that she had been unable to complete her service plan because she had been incarcerated until February 15, 2024. She argued that she needed an extension based on her need to complete her service plan and stated that, while in jail, she "participated in any available programs to prepare her and her children for a better life." According to the motion, "[e]xtraordinary circumstances" existed for the motion to be granted, and the motion was not sought solely for delay. At trial, Jill's counsel re-urged the motion and argued that section 263.401(b) had shown extraordinary circumstances that Jill had spent a significant time incarcerated, was unable to participate in services while incarcerated, and needed more time to complete her service plan. The Department argued that this was not an extraordinary circumstance, and that Jill had an opportunity to complete her service plan because she was not incarcerated at the beginning of the case and was released in February prior to the June trial setting. The trial court denied the request for extension stating it was unable to find "extraordinary circumstances to warrant" the extension.

A trial court may grant a 180-day extension of the dismissal deadline in a suit filed by the Department to terminate a parent-child relationship on a showing that "extraordinary circumstances necessitate the child remaining in the temporary

managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." Tex. Fam. Code Ann. § 263.401(b). We review a trial court's decision to deny an extension of the dismissal date under an abuse of discretion standard. *See In re K.S.*, No. 09-22-00041-CV, 2022 Tex. App. LEXIS 4835, at *8 (Tex. App.—Beaumont July 14, 2022, pet. denied) (mem. op.) (citing *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008, pet. denied)); *see also In re G.L.B.*, No. 10-16-00093-CV, 2016 Tex. App. LEXIS 8293, at *1 (Tex. App.—Waco Aug. 3, 2016, no pet.) (mem. op.); *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied). "The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). "The mere fact that a trial judge may decide a matter within [the trial judge's] discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Id.* at 242.

Section 263.401 provides no definition for the term "extraordinary circumstances." *See In re K.S.*, 2022 Tex. App. LEXIS 4835, at *7-8. This Court has noted that the "commonly understood" definition of the term is "more than ordinary:

33

not of the ordinary order or pattern or norm." *See id.* at \*8 n.7 (citing Webster's Third New International Dictionary 807 (2002)). The focus on granting this extension "is on the needs of the child, whether extraordinary circumstances necessitate the child remaining in the temporary custody of the Department, and whether continuing such is in the best interest of the child." *In re A.J.M.*, 375 S.W.3d at 604. A parent's incarceration is generally considered to be the parent's fault and not an extraordinary circumstance. *In re M.S.*, 602 S.W.3d 676, 680 (Tex. App.—Texarkana 2020, no pet.); *see also In re A.S.*, No. 12-16-00104-CV, 2016 Tex. App. LEXIS 10697, at \*3 (Tex. App.—Tyler Sept. 30, 2016, no pet.) (mem. op). "[W]hen a parent, through her own choices, fails to comply with a service plan and then requests an extension of the statutory dismissal date in order to complete the plan, the trial court does not abuse its discretion by denying the extension." *See In re A.S.*, 2016 Tex. App. LEXIS 10697, at \*\*3-4 (citing *In re K.P.*, No. 02-09-00028-CV, 2009 Tex. App. LEXIS 6301, at \*\*11-12 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.)).

In this case, Jill's incarceration was the result of her own actions. Her inability to complete services due to her confinement was not an extraordinary circumstance but was instead the consequence of poor choices. *See In re M.S.*, 602 S.W.3d at 680 (citing *In re C.J.B.*, No. 05-19-00165-CV, 2019 Tex. App. LEXIS 7470, at \*32 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.)). The statute's clear preference is

to complete the process within the one-year period. *In re A.J.M.*, 375 S.W.3d at 605. Given this preference and the fact that a parent's incarceration is generally considered to be the parent's fault and not an extraordinary circumstance, we cannot say the trial court abused its discretion in denying Jill's request for an extension. *See In re M.S.*, 602 S.W.3d at 680; *In re A.S.*, 2016 Tex. App. LEXIS 10697, at \*\*3-4. We overrule Jill's first issue.

Jill's Evidentiary Issues on Appeal

In Jill's second issue, she argues that the trial court abused its discretion in admitting Petitioner's Exhibit #2, Paramedic Raymon's report from the scene of Wayne's assault of Jill. According to Jill, the report included inadmissible hearsay—admissions where Jill stated she was 35 weeks pregnant and denied having had any prenatal care during the pregnancy and comments made by the paramedic that Jill had fresh marks on her arm consistent with drug use. She argues that the admission of Petitioner's Exhibit #2 into evidence harmed her "to the point that the trial court terminated [Jill's] maternal rights." In her third issue, she argues the trial court abused its discretion in admitting Petitioner's Exhibit #11, the lab results from Jill's drug test on April 4, 2024, indicating she tested positive for methamphetamine. Jill contends that "the Department did not prove the beginning and end of the chain of custody[]" for Petitioner's Exhibit #11 and that the erroneous admission of the

exhibit into evidence "prejudicially harmed [Jill] and prejudiced the trial court against her."

We review the admission of evidence for an abuse of discretion. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *See Downer*, 701 S.W.2d at 241-42. "To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, 'rendition of an improper judgment.'" *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting Tex. R. App. P. 44.1(a)(1); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). In conducting this harm analysis, we review the entire record. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995); *Benavides*, 189 S.W.3d at 879. The erroneous admission is harmless if the evidence is merely cumulative of evidence admitted elsewhere at trial. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

A. Admission of Petitioner's Exhibit #2

As explained above, even if the court erred by admitting Petitioner's Exhibit #2, that error would be harmless if the same evidence was admitted elsewhere

without objection. *See id.*; *In re E.A.K.*, 192 S.W.3d 133, 148 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (Any error in the admission of evidence is harmless if the objecting party permits the same or similar evidence to be introduced without objection.). Without objection, Paramedic Raymon testified that when she arrived on the scene, everyone was outside in the driveway, and Jill said she was pregnant and was "obviously pregnant[]" at the time. According to Raymon, when Jill was being administered an IV, Raymon noticed what appeared to be multiple "injection marks[]" on Jill's arms. Raymon testified that Jill told her that she had not seen a doctor in regard to the pregnancy and she was not receiving prenatal care. We conclude the error, if any, in admitting Petitioner's Exhibit #2 was harmless. *See id.* We overrule Jill's second issue.

B. Admission of Petitioner's Exhibit #11

When the opposing party timely voices a hearsay objection, the other party offering the evidence bears the burden of showing that the evidence is either not hearsay or that it fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004); *see also* Tex. R. Evid. 802. Rules 803 and 804 outline exceptions to the hearsay rule and 803 includes an exception for certain business records. *See* Tex. R. Evid. 803, 804.

We conclude that the trial court did not abuse its discretion in admitting Exhibit #11 because the trial court could have reasonably determined that the business record exception applied to the drug test records. For example, Texas Rule of Evidence 803(6) provides an exception to the hearsay rule of business records if:

> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
> (B) the record was kept in the course of a regularly conducted business activity;
> (C) making the record was a regular practice of that activity;
> (D) all of these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and
> (E) the opponent fails to demonstrate that the source of information or the method of circumstances of preparation indicate a lack of trustworthiness.

"Business" as used in this paragraph includes every kind of regularly organized activity whether conducted for profit or not.

Tex. R. Evid. 803(6)(A)-(E); *see also* Tex. R. Evid. 902(10) (providing that certain business records accompanied by an affidavit as outlined in the rules are self-authenticating). Under Rule 803(6), the records of a business may include records created by that business and in some instances records from a third party that are incorporated into the records of the other business if: (1) the document is incorporated and kept in the course of the testifying witness's business, (2) that business typically relies upon the accuracy of the document's content; and (3) the circumstances otherwise indicate the document's trustworthiness. *See In re J.N.P.*, No. 09-20-00245-CV, 2021 Tex. App. LEXIS 1827, at **20-21 (Tex. App.—

38

Beaumont Mar. 11, 2021, no pet.) (mem. op.) (collecting cases from the Courts of Appeal addressing the admissibility of third-party documents as business records).

The report of the drug test result was accompanied by an affidavit that complies with Texas Rule of Evidence 902(10)(B). Additionally, the drug test report showed sufficient indicia of trustworthiness to bring it within the business-records exception to the hearsay rule. *See* Tex. R. Evid. 803(6); *In re O.G.H.D.*, No. 09-21-00172-CV, 2021 Tex. App. LEXIS 8002, at **21-22 (Tex. App.—Beaumont Sept. 30, 2021, no pet.) (mem. op.). The business-records affidavit accompanying Jill's April 2024 drug test results states that the drug test utilized "strict chain of custody procedures[]" and "was performed utilizing GC/MS (gas chromatography/mass spectrometry) instruments by a certified scientist and reviewed by a licensed medical review officer." The affidavit further states that a record of the test result was kept in the regular course of business of The Alcohol and Drug Testing Service and that it is in the regular course of business of that entity for an employee or representative with knowledge of the act, event, condition, opinion, or diagnosis to record the information at or reasonably near the time it occurred. The drug test was signed by a Certified Medical Review Officer—an M.D.—verifying that the test was positive. The test result identifies the collection site, date, type of panel test used, and name of the lab that performed the test. Attached to the business-records affidavit was the laboratory report indicating the quantitative results and identifying the lab as "DHHS

39

Certified[.]" We conclude that the trial court did not abuse its discretion in determining that the drug test report and accompanying affidavit marked as Petitioner's Exhibit #11 showed sufficient indicia of trustworthiness to be properly admitted as a business record. *See id.*

We also conclude that even if the court had erred by admitting the exhibit, any such error would be harmless because the same evidence was admitted elsewhere without objection. *See In re O.G.H.D.*, 2021 Tex. App. LEXIS 8002, at **23-24 (citing *In re E.A.K.*, 192 S.W.3d at 148); *see also Nissan Motor Co., Ltd.*, 145 S.W.3d at 144. At trial, Jill testified as follows:

> [Jill's Counsel:] And then you tested on April 4, 2024; and you were positive for methamphetamine?
>
> [Jill:] I guess so.
>
> [Jill's Counsel:] When's the last time you've used methamphetamine?
>
> . . . .
>
> [Jill:] I don't think I failed that drug test, but, I mean, probably since then, I guess. The 4th, I guess.

We overrule Jill's third issue.

### Statutory Grounds D and E

Both Jill and Wayne challenge the sufficiency of the evidence supporting the trial court's findings under statutory grounds D and E. In Jill's fourth issue addressing D and E, she argues that the Department presented no evidence of

endangerment. In Wayne's first issue, he challenges that the Department did not have any expert witnesses or the children's treating physicians testify as to any of the children's well-being or any injuries they sustained, and that the only evidence from the Department on subsection D was hearsay and conclusory from the Department's witnesses. In his second issue, Wayne asserts that speculative and conclusory evidence is not enough to support termination under subsection E, and that at trial "the attorney ad litem did not produce any evidence of the children's expressed desires which would be remarkable considering the age of the children[.]"

We are required to consider the sufficiency of the evidence pursuant to sections 161.001(b)(1)(D) or (E) if challenged. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to one of these, it will not be necessary to address the other predicate grounds because sufficient evidence as to only one predicate ground for termination in addition to the best interest finding is all that is necessary to affirm a termination judgment. *Id.* at 232-33. Because evidence of statutory grounds D and E may be related, we may consolidate our review of the evidence supporting these grounds. *See In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022); *In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

41

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "'A finding of endangerment under subsection E, however, may be based on conduct both before and after removal.'" *In re A.S.*, No.

42

09-24-00116-CV, 2024 Tex. App. LEXIS 6892, at *33 (Tex. App.—Beaumont Sept. 19, 2024, pet. denied) (mem. op.) (quoting *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied)). "[E]ndangerment encompasses . . . conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "A child is endangered when a parent is aware but consciously disregards that an environment creates the potential for danger." *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345 n.4 (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Abusive or violent conduct by a parent may produce a home environment that endangers a child's well-being. *In re M.S.*, 662 S.W.3d 620, 630 (Tex. App.—Beaumont 2023, pet. denied) (citing *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied). "'Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual

injury to the child.'" *Id.* (quoting *In re K.A.R.*, No. 04-17-00723-CV, 2018 Tex. App. LEXIS 2548, at *9 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.)). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021).

A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). Endangerment does not require a parent's drug use to directly harm the child. *In re R.R.A.*, 687 S.W.3d at 278.

> While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm. A reviewing court should not evaluate drug-use evidence in

44

> isolation; rather, it should consider additional evidence that a factfinder
> could reasonably credit that demonstrates that illegal drug use presents
> a risk to the parent's "ability to parent."

*Id.* at 279 (citation omitted).

The record includes evidence of numerous facts that demonstrate Jill engaged in conduct and behavior of endangerment. The record reflects that Jill had ongoing drug issues throughout the pendency of the case, was incarcerated, and continued to stay with Wayne despite his assault and domestic violence against her. The record shows that Jill used drugs while pregnant with Sarah and after giving birth to Sarah. According to the appellate record, Jill and Sarah both tested positive for methamphetamine at the time of Sarah's birth. Jill agreed that since the time her children were removed in this case, she has been arrested three times for offenses— two times for possession of a controlled substance and once for burglary of a building. The trial court heard testimony that Jill appeared under the influence at a visit and fell asleep and almost dropped Sarah. The trial court also heard testimony that Jill had been kicked out of a drug rehab program during the pendency of the case. These acts or omissions establish a course of conduct from which the trial court could have reasonably determined that Jill endangered the children's emotional and physical well-being. *See In re M.C.*, 2019 Tex. App. LEXIS 2961, at **15-16; *see also In re S.R.*, 452 S.W.3d at 361; *Walker*, 312 S.W.3d at 617. The trial court could have also reasonably concluded that Jill's behavior created an unstable life for the

children. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Jill, through her individual acts or omission or a course of conduct endangered the children's physical or emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 344-45.

We conclude that the Department established, by clear and convincing evidence, that Jill committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence that the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Jill endangered the children. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule the part of Jill's fourth issue challenging the sufficiency of the evidence supporting the trial court's findings that Jill committed one or more predicate acts or omissions under section 161.001(b)(1).[2]

---

[2] We need not address Jill's challenges to the sufficiency of the evidence supporting the trial court's findings of violations of the other subsections of section

46

The record also includes evidence that demonstrates Wayne's conduct and behavior of endangerment. The record includes evidence of Wayne's criminal history and his admission of being at fault for the removal of the children by the Department. The record includes evidence of Wayne's drug use, domestic abuse against Jill, and prior assaults and incarcerations. The trial court also heard evidence that Wayne admitted being high on one occasion when he tried to pick Luke up. These acts and omissions create a course of conduct from which the trial court could reasonably have formed a firm belief or conviction that Wayne endangered the children's emotional and physical well-being. *See In re M.C.*, 2019 Tex. App. LEXIS 2961, at \*\*15-16; *see also In re S.R.*, 452 S.W.3d at 361-62; *Walker*, 312 S.W.3d at 617. The trial court could have also reasonably concluded that Wayne's behavior created an unstable life for the children. *See In re S.D.*, 980 S.W.2d at 763; *Dupree*, 907 S.W.2d at 84. Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Wayne, through his individual acts or omission or a course of conduct endangered the children's physical or emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 344-45. We conclude that the Department established, by clear

---

161.001 cited in the trial court's Order of Termination. *See In re N.G.*, 577 S.W.3d 230, 232-33 (Tex. 2019).

47

and convincing evidence, that Wayne committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence that the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Wayne endangered the children. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Wayne's first and second issues.[3]

## Best Interest

Both Jill and Wayne challenge the sufficiency of the evidence supporting the trial court's finding that termination of their parental rights was in the children's best interest. In Jill's fourth issue, she argues the evidence showed that she had a large support group; she had maintained contact with the Department during the case; she had completed some of her services required by her service plan; the visits in the past few months between Jill and her children had been good; she had removed

---

[3] We note that Wayne does not challenge the trial court's findings that the Department proved by clear and convincing evidence that Wayne constructively abandoned the children under section 161.001(b)(1)(N) and that Wayne failed to comply with the court-ordered service plan under section 161.001(b)(1)(O). To prevail on appeal, a party must challenge the sufficiency of each affirmative finding of a predicate ground for termination or at a minimum challenge the best interest finding. *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.). However, if parental rights are terminated pursuant to section 161.001(b)(1)(D) or (E), we must determine whether the evidence supports that finding even if there are other grounds for termination. *See In re N.G.*, 577 S.W.3d at 235-36.

herself from bad influences, she had a house and a job; and she finished her GED. She also contends that Sheila, a family friend, testified that she believed it was in the children's best interest to be returned to Jill, and Alex, Jill's boyfriend at the time of trial, did not have any concerns about Jill being around his children. In Wayne's third issue, he argues the Department presented no evidence that Luke wanted Wayne's parental rights terminated, and the attorney ad litem did not produce any evidence of the children's expressed desires regarding termination of Wayne's parental rights. Wayne also argues that the Department presented no evidence that he could not provide for the emotional and physical needs of the children if he was acquitted from his pending criminal case; the evidence of any current and future danger that Wayne posed to the children was insufficient and did not support termination; the evidence showed Wayne had participated in counseling and domestic violence classes as well as drug rehab classes; there was no testimony as to the stability of the children's foster parents' home; and Wayne attempted to complete his service plan while incarcerated.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann.

49

§ 153.131(b). Prompt and permanent placement of a child in a safe environment is also presumed to be in a child's best interest. Tex. Fam. Code Ann. § 263.307(a). When determining the best interest of the child, a court may consider circumstantial and direct evidence, subjective factors, and the totality of the evidence, and evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system

consisting of an extended family member and friends is available to the child. Tex. Fam. Code Ann. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

In a best-interest analysis, the focus is on the best interest of the child, not the best interest of the parent. *Dupree*, 907 S.W.2d at 86. Often, the evidence that supports the predicate findings on the D and E grounds may also support the trial court's best-interest finding. *In re T.R.S.*, No. 09-18-00482-CV, 2019 Tex. App. LEXIS 4913, at *15 (Tex. App.—Beaumont June 13, 2019, no pet.) (mem. op.) ("The same evidence that supports a trial court's findings under subsections D, E, . . . may also be relevant to the trial court's best-interest finding."). And the Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in the child's best interest, particularly when the evidence is undisputed that the parent endangered the child. *In re C.H.*, 89 S.W.3d at 27. As the reviewing court, the question we must decide is whether the record, when considered as a whole, supports the trial court's best-interest finding. *Id.* at 28.

As already mentioned above, the trial court found that Jill and Wayne each endangered the children based on the evidence presented at trial. A parent's past conduct is relevant to a trial court's decision about what is in a child's best interest. *Id.* at 27-28. As already discussed, the trial court heard evidence of Jill's drug abuse that continued during the pendency of the case, the domestic violence between Wayne and Jill, their drug use together, their criminal histories including Wayne's

history of assaults, and Wayne's continued contact with Jill and her family during the pendency of the case. The trial court heard evidence that Jill used drugs while pregnant with Sarah, and that both tested positive for methamphetamines at Sarah's birth. The trial court heard evidence of Jill's injuries caused by Wayne's violence and her reluctance to seek medical attention and reluctance to testify as to the violence he inflicted on her. The trial court heard evidence that both Jill and Wayne failed to complete court-ordered services as required by the respective service plans. Testimony presented at trial indicated that the children were doing well in their foster home and were bonded with their foster parents.

Deferring to the trial court's role as the sole arbiter of the facts, we conclude the record contains legally and factually sufficient evidence to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(b); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We overrule Wayne's third issue, as well as the part of Jill's fourth issue, challenging the sufficiency of the evidence supporting the trial court's determination that termination of parental rights was in the children's best interest.

Appointment of the Department as the Sole Managing Conservator

In Wayne's fourth issue, he challenges the legal and factual sufficiency of the evidence supporting the trial court's appointment of the Department as the children's sole managing conservator. Wayne contends that evidence at trial supports that there

53

were family members seeking placement, no factual evidence was presented supporting the Department being named the children's managing conservator, and that the only reason the Department was appointed was because Wayne's parental rights were wrongfully terminated.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We will reverse the trial court's appointment of managing conservator only if we determine it was arbitrary or unreasonable. *Id.*; *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.). The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless that such appointment would not be in his best interest "because the appointment would significantly impair the child's physical health or emotional development[.]" Tex. Fam. Code Ann. § 153.131(a).

As discussed above, sufficient evidence supports the trial court's order terminating Wayne's parental rights. When the parents' rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator. *See id.* § 161.207; *In re N.T.*, 474 S.W.3d at 479-80. Section 161.207(a) provides, "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). We cannot

conclude that the trial court abused its discretion by appointing the Department as the children's managing conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re N.T.*, 474 S.W.3d at 479-80. We overrule Wayne's fourth issue.

Having overruled all of Appellants' issues on appeal, we affirm the Order of Termination.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on November 13, 2024
Opinion Delivered January 16, 2025

Before Golemon, C.J., Johnson and Chambers, JJ.

55